No. 25-2463

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

———————

MEDIA MATTERS FOR AMERICA, ANGELO CARUSONE, and ERIC HANANOKI,

*Plaintiffs-Appellees*,

v.

X CORP., TWITTER INTERNATIONAL UNLIMITED CO., and
TWITTER ASIA PACIFIC PTE. LTD.,

*Defendants-Appellants*.

———————

On Appeal from the United States District Court for the
Northern District of California (No. 3:25-cv-2397)

———————

## OPENING BRIEF FOR X CORP., TWITTER INTERNATIONAL
## UNLIMITED CO., AND TWITTER ASIA PACIFIC PTE. LTD.

———————

JUDD E. STONE, II
CODY C. COLL
ARI CUENIN
STONE HILTON, PLLC
600 Congress Avenue, Suite 2350
Austin, TX 78701

PAUL D. CLEMENT
MATTHEW D. ROWEN
KEVIN WYNOSKY
NICCOLO A. BELTRAMO*
CLEMENT & MURPHY, PLLC
706 Duke St.
Alexandria, VA 22314
(202) 742-8900
paul.clement@clementmurphy.com

* Supervised by principals of the firm who are
members of the Virginia bar

*Counsel for Defendants-Appellants*
*X Corp., Twitter International Unlimited Co., and Twitter Asia Pacific Pte. Ltd.*

May 14, 2025

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1(a), X Corp., Twitter International Unlimited Co., and Twitter Asia Pacific Pte. Ltd. certify as follows:

X Corp. is owned by X Holdings Corp., which is owned by X.AI Holdings Corp. X Corp. owns T.I. Group I LLC, which owns Lorikeet Inc., which owns Twitter International Unlimited Co. Twitter International Unlimited Co. owns Twitter Asia Pacific Pte. Ltd. No publicly held corporation owns 10% or more of X Corp., Twitter International Unlimited Co., or Twitter Asia Pacific Pte. Ltd.'s stock.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ......................................................... i

TABLE OF AUTHORITIES....................................................................... iv

INTRODUCTION ........................................................................................ 1

JURISDICTIONAL STATEMENT ............................................................ 5

STATEMENT OF THE ISSUE.................................................................. 5

STATEMENT OF THE CASE.................................................................... 6

     A.    Legal Background ...................................................................... 6

     B.    Factual Background.................................................................... 8

         1.    Media Matters' "sabotage" harms TIUC, TAP, and X Corp. ............................................................................... 8

         2.    X Corp., TIUC, and TAP each sue to enforce their rights..................................................................................... 10

     C.    Procedural History.................................................................. 16

SUMMARY OF ARGUMENT.................................................................. 22

STANDARD OF REVIEW ...................................................................... 27

ARGUMENT ............................................................................................ 28

I.    At The Absolute Least, The District Court's Failure To Issue An Opinion Addressing The Relevant Considerations Requires Vacatur ......... 28

II.    The Stated Reasons For The Injunction Are Demonstrably Wrong............. 29

III.    There Are Multiple Additional Reasons Why It Was A Manifest Abuse Of Discretion To Issue This Preliminary Anti-Suit Injunction ......... 41

     A.    The District Court Lacks Subject-Matter Jurisdiction ....................... 41

     B.    Subject-Matter Jurisdiction Aside, the Northern District of California Is Not the Proper Venue for this Dispute .......................... 46

C.   The District Court's Truncated Application of the *Gallo* Standard Was Demonstrably Erroneous ............................................... 49

D.   Plaintiffs Failed to Carry Their Burden on the Remaining Preliminary-Injunction Factors ........................................... 52

CONCLUSION ..................................................................................... 57

STATEMENT OF RELATED CASES

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Cases**

*Aguilar Fermin v. Barr*,
 958 F.3d 887 (9th Cir. 2020).................................................................39

*Alcantar v. Hobart Serv.*,
 800 F.3d 1047 (9th Cir. 2015)..............................................................53

*Allen v. Ornoski*,
 435 F.3d 946 (9th Cir. 2006).................................................................34

*Applied Med. Distrib. Corp. v. Surgical Co.*,
 587 F.3d 909 (9th Cir. 2009)...................................................................7

*Atl. Marine Const. Co. v. U.S. Dist. Ct. for W. Dist. of Tex.*,
 571 U.S. 49 (2013)................................................................................54

*BAE Sys. Tech. Sol. & Servs., Inc. v. Republic of Korea*,
 884 F.3d 463 (4th Cir. 2018)...................................................................7

*Bannister v. Knox Cnty. Bd. of Educ.*,
 49 F.4th 1000 (6th Cir. 2022)...................................................... 31, 34

*Bass v. Facebook, Inc.*,
 394 F.Supp.3d 1024 (N.D. Cal. 2019) ..................................................44

*Binns v. Am. Gen. Life & Accident Ins. Co.*,
 2023 WL 5125042 (9th Cir. 2023).......................................................42

*Burger King Corp. v. Rudzewicz*,
 471 U.S. 462 (1985).............................................................................52

*Citigroup Inc. v. Villar*,
 830 F.App'x 240 (9th Cir. 2020)........................................... 1, 22, 28

*Coleman v. Thompson*,
 501 U.S. 722 (1991).............................................................................32

*Comer v. Micor, Inc.*,
 436 F.3d 1098 (9th Cir. 2006)........................................ 25, 26, 44, 51

iv

*Consol. Edison Co. v. United States,*
  221 F.3d 364 (2d Cir. 2000) ........................................................... 23, 34

*Couveau v. Am. Airlines, Inc.,*
  218 F.3d 1078 (9th Cir. 2000) ................................................................35

*Danjaq LLC v. Sony Corp.,*
  263 F.3d 942 (9th Cir. 2001) ..................................................................35

*Diouf v. Mukasey,*
  542 F.3d 1222 (9th Cir. 2008) ................................................................28

*E. & J. Gallo Winery v. Andina Licores S.A.,*
  446 F.3d 984 (9th Cir. 2006) ......................................................... *passim*

*Firexo, Inc. v. Firexo Grp. Ltd.,*
  99 F.4th 304 (6th Cir. 2024) ..................................................................50

*Fisher v. Las Vegas Hilton Corp.,*
  47 F.App'x 824 (9th Cir. 2002) .............................................................46

*Flathead-Lolo-Bitterroot Citizen Task Force v. Montana,*
  98 F.4th 1180 (9th Cir. 2024) ................................................................53

*Food Safety Net Servs. v. Eco Safe Sys. USA, Inc.,*
  147 Cal.Rptr.3d 634 (Cal. App. 2012) ...................................................44

*Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.,*
  592 U.S. 351 (2021) ................................................................................50

*Fritsch v. Swift Transp. Co.,*
  899 F.3d 785 (9th Cir. 2018) ..................................................................43

*Ganpat v. E. Pac. Shipping PTE, Ltd.,*
  66 F.4th 578 (5th Cir. 2023) ....................................................................6

*Goss Int'l Corp. v. Man Roland Druckmaschinen Aktiengesellschaft,*
  491 F.3d 355 (8th Cir. 2007) ....................................................................7

*Haas v. Leo Feist, Inc.,*
  234 F. 105 (S.D.N.Y. 1916) ...................................................................35

*Hall v. Johnston*,
    758 F.2d 421 (9th Cir. 1985) ....................................................................6

*hiQ Labs, Inc. v. LinkedIn Corp.*,
    31 F.4th 1180 (9th Cir. 2022) ................................................................29

*In re Unterweser Reederei GMBH*,
    428 F.2d 888 (5th Cir. 1970) ....................................................................8

*Ins. Co. of N. Am. v. Moore*,
    783 F.2d 1326 (9th Cir. 1986) ................................................................28

*JL Beverage Co. v. Jim Beam Brands Co.*,
    828 F.3d 1098 (9th Cir. 2016) ................................................................53

*Jones v. GNC Franchising, Inc.*,
    211 F.3d 495 (9th Cir. 2000) ..................................................................46

*Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas*
    *Bumi Negara*,
    335 F.3d 357 (5th Cir. 2003) ....................................................................6

*Karo v. San Diego Symphony Orchestra Ass'n*,
    762 F.2d 819 (9th Cir. 1985) ........................................................... 50, 51

*Kline v. Burke Const. Co.*,
    260 U.S. 226 (1922) ..................................................................................4

*Laker Airways Ltd. v. Sabena*,
    731 F.2d 909 (D.C. Cir. 1984) ..................................................................4

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992) ................................................................................45

*M/S Bremen v. Zapata Off-Shore Co.*,
    407 U.S. 1 (1972) ....................................................................................45

*Magi XXI, Inc. v. Stato della Citta del Vaticano*,
    714 F.3d 714 (2d Cir. 2013) ..................................................................45

*Mazurek v. Armstrong*,
    520 U.S. 968 (1997) ................................................................................45

*Microsoft Corp. v. Motorola, Inc.*,
696 F.3d 872 (9th Cir. 2012) ........................................................ *passim*

*Military Audit Proj. v. Casey*,
656 F.2d 724 (D.C. Cir. 1981) ............................................................29

*Morgan v. Sundance*,
596 U.S. 411 (2022) ............................................................................31

*Pachinger v. MGM Grande Hotel-Las Vegas, Inc.*,
802 F.2d 362 (9th Cir. 1986) .............................................................42

*Pulliam v. Allen*,
466 U.S. 522 (1984) ............................................................................54

*Sanchez v. Monumental Life Ins. Co.*,
102 F.3d 398 (9th Cir. 1996) .............................................................43

*Schwebke v. United Wholesale Mortgage LLC*,
96 F.4th 971 (6th Cir. 2024) .............................................................34

*Seattle Totems Hockey Club, Inc. v. Nat'l Hockey League*,
652 F.2d 852 (9th Cir. 1981) ...............................................................6

*SEC v. Ross*,
504 F.3d 1130 (9th Cir. 2007) ...........................................................52

*SGIC Strategic Glob. Inv. Cap., Inc. v. Burger King Eur. GmbH*,
839 F.3d 422 (5th Cir. 2016) ...................................................... 13, 47

*Slater v. O'Brien's Moving and Storage, Inc.*,
931 F.2d 61 (9th Cir. 1991) ...............................................................42

*Sonner v. Premier Nutrition Corp.*,
49 F.4th 1300 (9th Cir. 2022) ...........................................................55

*Sowards v. United States*,
411 F.2d 787 (9th Cir. 1969) .............................................................29

*St. Paul Mercury Indem. Co. v. Red Cab Co.*,
303 U.S. 283 (1938) ............................................................................42

*Steel Co. v. Citizens for Better Env't,*
523 U.S. 83 (1998) ................................................................46

*United States v. Odessa Union Warehouse Co-op,*
833 F.2d 172 (9th Cir. 1987) ...................................................6

*United States v. Sineneng-Smith,*
590 U.S. 371 (2020) ..............................................................32

*United States v. Wheeler,*
795 F.2d 839 (9th Cir. 1986) .................................................28

*Valhal Corp. v. Sullivan Assocs., Inc.,*
44 F.3d 195 (3d Cir. 1995) ....................................................42

*Veolia Water UK PLC v. Fingal Cnty. Council*
[2006] IEHC 240 (Ir.) ...........................................................54

*Virginian Ry. Co. v. United States,*
272 U.S. 658 (1926) ..............................................................29

*Weiner v. Shearson, Hammill & Co., Inc.,*
521 F.2d 817 (9th Cir. 1975) ...................................................5

*Wells Fargo & Co. v. ABD Ins. & Fin. Servs., Inc.,*
758 F.3d 1069 (9th Cir. 2014) ...............................................27

*Winter v. NRDC,*
555 U.S. 7 (2008) ..................................................................53

*Wood v. Milyard,*
566 U.S. 463 (2012) ..................................................... 2, 24, 32

*X Corp. v. Media Matters for Am.,*
No. 4:23-cv-1175 (N.D. Tex.) .................................................13

*X Corp. v. Media Matters,*
2024 WL 4001803 (N.D. Tex. Aug. 29, 2024) ..................... 12, 13, 21

**Statutes and Rule**

28 U.S.C. §1332 ....................................................................41

28 U.S.C. §1404(a) ...............................................................46

28 U.S.C. §2107 .................................................................................5

Fed. R. Civ. P. 65(d)(1) ................................................................. 28

**Other Authorities**

Complaint, *X Corp. v. Media Matters for Am.*, No. 4:23-cv-01175,
2023 WL 8091661 (N.D. Tex. Nov. 20, 2023) ...................................12

Order, *X Corp. v. Media Matters of Am.*, No. 4:23-CV-01175
(N.D. Tex. May 2, 2025) ............................................................. *passim*

Restatement (Second) of Contract (Am. Law. Inst. 2024) .....................33

Williston on Contracts (4th ed. 2024) .................................. 33, 34, 50, 51

## INTRODUCTION

"Foreign anti-suit injunctions should not be issued routinely." *Microsoft Corp. v. Motorola, Inc.*, 696 F.3d 872, 889 (9th Cir. 2012). The one here should not have been issued at all.

The order enjoining Twitter International Unlimited Company ("TIUC"), an Irish private company, from continuing to litigate an Irish-law case it filed in Irish court in 2023, is all of two pages—and, not surprisingly, it overlooks a host of critical issues. The district court itself seemed to recognize as much, as it promised a more complete opinion would follow in due course. But due course is not yet: Over a month has gone by, and still no opinion has issued. At the very least, then, this Court should "vacate and remand," "[b]ecause the district court did not issue a clear ruling regarding the anti-suit injunction or provide a more robust explanation for its decision." *Citigroup Inc. v. Villar*, 830 F.App'x 240, 242 (9th Cir. 2020). Asking a foreign court to halt ongoing proceedings without a full explanation for that extraordinary action is inconsistent with comity and cannot stand.

But this Court should go further and reverse, as the injunction irretrievably "rest[s] upon an erroneous view of the law" and "a clearly erroneous view of the facts." *Microsoft*, 696 F.3d at 889. The district court gave two reasons for enjoining "the Ireland case," which TIUC has been litigating against Plaintiff Media Matters for 18 months now: (1) Media Matters allegedly did not act tactically in failing to

raise the forum-selection clause it now claims has always required the Irish suit to be brought in California; instead, "previous counsel for Media Matters" in Ireland "simply missed th[e] issue"; and (2) "the parties" in Ireland "haven't filed their briefs on Media Matters's jurisdictional challenge" there. 1-ER-2-3. It is doubtful that an anti-suit injunction would be warranted even if both premises were true; failure to issue-spot is not usually a promising basis for extraordinary equitable relief, let alone extraordinary equitable relief that implicates serious comity concerns. But neither is true here. Plaintiffs' counsel admitted on the record that Media Matters made "a considered decision" in the Irish case not to press the argument that a forum-selection clause (in a now-defunct contract to which TIUC was never a party) requires suit to be brought in California. 4-ER-709. And due to that "considered decision," the parties in Ireland are currently litigating Media Matters' jurisdictional challenge, having already exchanged extensive expert and factual submissions.

Those factual errors carried serious legal consequences. As noted, Media Matters did not just fail to timely assert a right; it made "a considered decision" to pursue other arguments instead. And while courts may excuse *forfeiture* if justice demands, they may not excuse *waiver*. It is "'an abuse of discretion' for a court 'to override'" a "deliberate waiver." *Wood v. Milyard*, 566 U.S. 463, 472-73 (2012). Resurrecting an argument a party has affirmatively relinquished would "depart from the principle of party presentation basic to our adversary system." *Id.* at 472.

2

This Court need not take Appellants' word for it: Just two weeks ago, the judge presiding over the parallel litigation between X Corp. and Media Matters that has been pending in the Northern District of Texas since 2023 held not only that Media Matters had waived any reliance on the forum-selection clause in those proceedings, but that its waiver severely prejudiced X Corp. Order, *X Corp. v. Media Matters of Am.*, No. 4:23-CV-01175 (N.D. Tex. May 2, 2025), Dkt.190 ("N.D. Tex. Order"). That holding reflected principles that apply as a matter of course in domestic litigation and that apply *a fortiori* when, as here, the waiver occurred not only in Texas, but in the courts of a co-equal foreign sovereign—and when excusing it would stop well-underway foreign litigation in its tracks because of the tactical choices of the party belatedly asserting its rights. Indeed, given that proceedings in Ireland have been well underway since 2023, the place to assert the forum-selection clause—even belatedly—was the Irish court, which would be better situated to judge Media Matters' litigation conduct and the prejudice to the ongoing proceedings. The Texas court's recent emphatic rejection of Media Matters' belated effort to raise the clause there suggests that any effort to do so in Ireland would not be well-received by the Irish court, which is just one more reason not to permit this extraordinary effort to enjoin foreign proceedings.

And that is only the tip of the iceberg. This diversity action never should have gotten off the ground, as it concerns a contract that caps damages at $100, which is

$74,900 short of 28 U.S.C. §1332's amount-in-controversy requirement. The district court also lacks *personal* jurisdiction over TIUC and the other foreign entity Plaintiffs sued, which even Plaintiffs admit are "at home" abroad, without California connections of their own. *See* 2-ER-15. What is more, the court barred TIUC from litigating in its home forum based on a forum-selection clause contained in an agreement *to which TIUC is not even a party*. And even putting those issues aside, if this dispute is to be litigated in an Article III court, the Northern District of California is not the place it should be heard; it should be transferred to the Northern District of Texas, where X Corp. and the Plaintiffs here have been litigating the same underlying claims for over 500 days (and where the terms of service in effect at the time Plaintiffs filed this action point). Finally, Plaintiffs did not even try to demonstrate a likelihood of irreparable injury absent preliminary relief—itself an independent basis to reverse this hastily issued injunction.

Federal courts do not take lightly to efforts by foreign tribunals "specifically intended to interfere with and terminate" judicial proceedings in U.S. court. *Laker Airways Ltd. v. Sabena*, 731 F.2d 909, 938 (D.C. Cir. 1984). In numerous contexts, the Supreme Court has described "conflict[s]" between equal judicial sovereigns as "unseemly," *e.g.*, *Kline v. Burke Const. Co.*, 260 U.S. 226, 231 (1922), and this Court too has singled out for special opprobrium "the friction created by the appearance that [a] second court is interfering with the first," *Weiner v. Shearson, Hammill &*

4

*Co., Inc.*, 521 F.2d 817, 820 (9th Cir. 1975). But federal courts can reasonably expect foreign courts to respect our judicial process only if we are willing to respect theirs. The anti-suit injunction the district court entered here turns those principles on their heads, as it not only directly interferes with foreign litigation already well underway, but does so pursuant to a largely unexplained order that fails on its own (few) terms. The absolute least this Court should do is vacate and remand. But given the multiple errors underlying the injunction, this Court should reverse outright. Foreign courts, and basic principles of equity and comity, deserve nothing less.

## JURISDICTIONAL STATEMENT

Defendants-Appellants TIUC, Twitter Asia Pacific Pte. Ltd. ("TAP"), and X Corp. seek review of an order granting a preliminary injunction. 1-ER-2. The district court purported to exercise jurisdiction under 28 U.S.C. §1332(a), 2-ER-15; this Court has jurisdiction under 28 U.S.C. §1292(a)(1). The district court entered its order on April 10, 2025. 1-ER-4. Appellants timely filed their notice of appeal on April 14. 4-ER-764; *see* 28 U.S.C. §2107.

## STATEMENT OF THE ISSUE

Whether the district court abused its discretion by entering a two-page order enjoining foreign judicial proceedings that had been pending for more than a year and a half in Ireland, when the only stated reasons for the injunction were clearly

erroneous as a matter of both fact and law, and the district court lacked both jurisdiction and venue in all events.

## STATEMENT OF THE CASE

### A. Legal Background

"A federal district court with jurisdiction over the parties has the power to enjoin them from proceeding with an action in the courts of a foreign country, although the power should be used sparingly." *Seattle Totems Hockey Club, Inc. v. Nat'l Hockey League*, 652 F.2d 852, 855 (9th Cir. 1981). Because that "ability to enter an anti-suit injunction" "derive[s]" from a court's inherent "equitable powers," *E. & J. Gallo Winery v. Andina Licores S.A.* ("*Gallo*"), 446 F.3d 984, 989 (9th Cir. 2006), it "must be guided by … 'well-established principles governing the award of equitable relief," *United States v. Odessa Union Warehouse Co-op*, 833 F.2d 172, 177 (9th Cir. 1987), including "estoppel, laches, waiver, in pari delicto, ratification, and unclean hands," *Hall v. Johnston*, 758 F.2d 421, 422 (9th Cir. 1985). In applying those principles, a court must not lose sight that "a foreign antisuit injunction is 'an extraordinary remedy' fraught with 'unique' concerns regarding international comity." *Ganpat v. E. Pac. Shipping PTE, Ltd.*, 66 F.4th 578, 586 (5th Cir. 2023) (Jones, J., dissenting) (quoting *Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 335 F.3d 357, 363, 364 (5th Cir. 2003)).

In addition to those background principles of equity, this Court's decision in *Gallo* announced "a three-part inquiry for assessing the propriety of" "a foreign anti-suit injunction" in this Circuit.[1] *Microsoft*, 696 F.3d at 881 (discussing *Gallo*); *see id.* at 883-84 ("[T]he likelihood-of-success aspect of the traditional preliminary injunction test is replaced by the *Gallo* test" "when a preliminary injunction is also a foreign anti-suit injunction."). "First," the court "determine[s] 'whether or not the parties and the issues are the same' in both the domestic and foreign actions, 'and whether or not the first action is dispositive of the action to be enjoined.'" *Id.* (quoting *Gallo*, 446 F.3d at 991). While the issues in the two proceedings need not "be precisely and verbally identical" for this factor to be satisfied, an anti-suit injunction should not be granted unless all the contested issues are capable of "be[ing] resolved in the local action." *Applied Med. Distrib. Corp. v. Surgical Co.*, 587 F.3d 909, 915 (9th Cir. 2009).

---

[1] The courts of appeal are divided 6-3 over the proper standard for a foreign anti-suit injunction. This Circuit, along with the Fifth and Seventh Circuits, take a "liberal approach" relative to the First, Second, Third, Sixth, Eighth, and D.C. Circuits', which urge "great[er] restraint" and "appreciably greater weight to considerations of international comity." *Goss Int'l Corp. v. Man Roland Druckmaschinen Aktiengesellschaft*, 491 F.3d 355, 359-60 (8th Cir. 2007); *see also BAE Sys. Tech. Sol. & Servs., Inc. v. Republic of Korea*, 884 F.3d 463, 479 (4th Cir. 2018) (noting the split but declining to take sides). Although Appellants acknowledge that *Gallo* binds this panel, Appellants respectfully reserve the right to petition for rehearing or certiorari on whether *Gallo* or the majority approach is correct.

If this "threshold consideration" is satisfied, the court next "determine[s] whether at least one of the so-called 'Unterweser factors' applies." *Microsoft*, 696 F.3d at 881-82; *see In re Unterweser Reederei GMBH*, 428 F.2d 888, 896 (5th Cir. 1970). "The *Unterweser* factors are a disjunctive list of considerations that may justify a foreign anti-suit injunction": "'[whether the] foreign litigation … would (1) frustrate a policy of the forum issuing the injunction; (2) be vexatious or oppressive; (3) threaten the issuing court's *in rem* or *quasi in rem* jurisdiction; or (4) where the proceedings prejudice other equitable considerations.'" *Microsoft*, 696 F.3d at 881-82 (alterations in original) (quoting *Gallo*, 446 F.3d at 990).

Third, the court "assess[es] whether the injunction's 'impact on comity is tolerable.'" *Id.* at 881. This final inquiry is "'complex and elusive,'" turning on, *inter alia*, "[t]he order in which the domestic and foreign suits were filed" and whether the requested injunction is "limited in" "scope" and "time." *Id.* at 886-87.

## B. Factual Background

### 1. Media Matters' "sabotage" harms TIUC, TAP, and X Corp.

Underlying these proceedings is an extraordinary effort by Media Matters for America, a self-styled "progressive research and information center" dedicated to waging "guerrilla warfare and sabotage" against "conservative news sources," to drive major corporations away from advertising on X, the global social-media website formally known as Twitter, in the wake of Elon Musk's acquisition of the

company. *See, e.g.*, 2-ER-109-11, 120 ("[N]o advertiser is safe while Elon Musk controls X."). To kickstart their campaign, Media Matters and its president, Angelo Carusone, tasked senior investigative reporter Eric Hananoki with using X in a way no normal person would: Curating an account following just a handful of users comprising (on the one hand) people infamous for churning out loathsome, fringe content and (on the other) blue-chip companies, and then incessantly scrolling and refreshing his feed until he stumbled across controversial content appearing adjacent to major brand advertising. The ploy produced the desired results, generating six instances in which abhorrent speech was adjacent to blue-chip advertisers' speech. 2-ER-111-12, 123-25.

Those six gerrymandered adjacencies were virtual unicorns in the truest sense. Despite refreshing his feed so frequently that he generated orders of magnitude more advertisements than the average X user, Hananoki was the only X user *out of more than 500 million worldwide* to encounter five of the six published adjacencies; as for the remaining adjacency, it was seen by exactly *one* other account. 2-ER-112-14. In total, the adjacencies represented 0.0000009090909% of the daily impressions on the platform. 2-ER-126. Nevertheless, once Hananoki brute-forced X's algorithm into generating the six unicorn adjacencies, Media Matters ran screenshots of them in a November 16, 2023 article vituperatively claiming that "X has been placing ads for Apple, Bravo, IBM, Oracle, and Xfinity next to pro-Nazi content," 2-ER-105,

and Carusone falsely stated that they had identified these adjacencies simply by using the platform the way a normal user would, *see* 2-ER-113.

Media Matters' ploy worked. Within days of the article's publication, Apple, Comcast, NBCUniversal, IBM, Lionsgate, Warner Bros. Discovery, Paramount, and Sony all pulled their advertisements from the platform. 2-ER-127-28. These were some of X's biggest advertisers, and it is hard to overstate the damages in forgone revenue and lost brand equity sustained not just by X Corp. (which operates X in America), but also by TIUC (which operates the service in Europe) and TAP (which contracts with advertisers in Asia). 2-ER-110; 3-ER-336.

## 2. X Corp., TIUC, and TAP each sue to enforce their rights.

Although X Corp., TIUC, and TAP are commonly owned, they are distinct entities operating under distinct legal regimes and imposing distinct terms of service (or, in the case of TAP—which does not operate the platform in Asia and thus contracts only with advertisers in Asia—no terms of service at all). For example, at the time Hananoki (mis)used the platform to create the unicorn adjacencies, X Corp.'s terms of service featured a forum-selection clause requiring "[a]ll disputes related to these Terms or the Services [to] be brought solely in the federal or state courts located in San Francisco County, California," 2-ER-58; TIUC's terms of

10

service, by contrast, imposed no forum-selection clause at all, *cf.* 2-ER-59-66.[2] Similarly, at all relevant times, X Corp.'s terms of service included a broad limitation-of-liability clause capping X Corp.'s aggregate liability at "the greater of $100 USD or the amount you paid us, if any, in the past six months," 2-ER-50, 58; TIUC's terms of service, by contrast, limited liability "to the maximum extent permissible in [the user's] country of residence," 2-ER-66.

Most relevant for present purposes, X Corp., TIUC, and TAP independently enter into unique contracts with advertisers specific to their respective theater of operations. *See, e.g.*, 3-ER-331; 2-ER-80, 83, 94-95. Because each company thus faced disparate damages subject to varying theories of liability, each company filed suit against Media Matters in its respective home country.[3]

**a.)** Four days after Media Matters published its defamatory article, X Corp. sued it and Hananoki in the Northern District of Texas for tortious interference, business disparagement, and interference with prospective economic advantage. 2-ER-128-33; *see* Complaint, *X Corp. v. Media Matters for Am.*, No. 4:23-cv-01175,

---

[2] Since then, X Corp. has updated its terms to require that disputes be brought in its current home jurisdiction of Texas, 4-ER-540, and TIUC has added a forum-selection clause requiring disputes to be brought in Ireland, 4-ER-548.

[3] One other entity of note is Twitter UK Ltd ("TUK"), which operates the X platform in the United Kingdom. TUK sent Media Matters a cease-and-desist letter in December 2023 explaining how Hananoki's article specifically harmed TUK's UK advertising base. 2-ER-157. TUK ultimately chose not to sue.

2023 WL 8091661 (N.D. Tex. Nov. 20, 2023), Dkt.1. X Corp. selected that venue because, *inter alia*, several of the targeted advertisers were headquartered or incorporated in Texas and Musk was then living and making decisions about X there. 2-ER-116-17.

At the time, X Corp.'s terms of service had a forum-selection clause requiring any cases arising out of use of the platform to be brought in California. *See* p.10, *supra*. Media Matters was plainly aware of that provision: In moving to dismiss "for Lack of Personal Jurisdiction, Improper Venue, and Failure to State a Claim," *X Corp. v. Media Matters*, 2024 WL 4001803, at *1 (N.D. Tex. Aug. 29, 2024), it highlighted the terms of service in its briefing. Nevertheless, and despite challenging the forum on other grounds, it conspicuously declined to bring a forum challenge to the Texas lawsuit based on the forum-selection clause. *See* 3-ER-512, 515.

The district judge presiding over the Texas case (O'Connor, J.) denied the motion to dismiss. As to jurisdiction, Judge O'Connor held that X Corp. plausibly alleged that Media Matters engaged in "tortious acts" that were "target[ed] … at the headquarters of Texas based companies," which "is sufficient to establish specific jurisdiction in Texas." *X Corp.*, 2024 WL 4001803, at *4; *see id.* at *4-6. Turning to venue, Judge O'Connor began by noting that Media Matters had declined to "seek a transfer of venue" under 28 U.S.C. §1404, *id.* at *6 n.27, instead arguing only that venue was lacking under Rule 12(b)(3), *id.* at *6. But that latter argument failed for

the same reason their jurisdiction argument failed. *Id.* ("Plaintiff sufficiently alleges a substantial part of the events occurred within the Northern District of Texas."). Finally, Judge O'Connor held that X Corp. had plausibly alleged all three of its claims, finding each of the claims plausible. *Id.* at *7-8

With the motion to dismiss denied, discovery in the Texas case is well underway—Judge O'Connor has already ruled on at least five contested motions— and is scheduled to conclude in the coming months. *See generally X Corp. v. Media Matters for Am.*, No. 4:23-cv-1175 (N.D. Tex.), Dkts.65, 81, 98, 135, 169, 194.

That, however, did not stop Media Matters from recently filing a motion to transfer the now-500-day-old Texas case to the Northern District of California. *See id.*, Dkt.152. Judge O'Connor correctly denied that belated motion, explaining that the Plaintiffs here (defendants there) "waived their right to transfer this action under the forum selection clause." N.D.Tex.Order.5. First, they had waived it by "conduct," as they "wait[ed] over a year and a half" to raise the issue, even after "moving to dismiss a case on the merits (twice), engaging in numerous discovery disputes, and appealing an unfavorable decision to the Fifth Circuit." *Id.* Second, they "'substantially invoke[d] the judicial process' by their actions in th[e Texas] litigation, most conspicuously by moving to dismiss … and appealing to the Fifth Circuit." *Id.* (first alteration in original) (quoting *SGIC Strategic Glob. Inv. Cap., Inc. v. Burger King Eur. GmbH*, 839 F.3d 422, 426 (5th Cir. 2016)). Those actions

13

plainly "prejudiced [X Corp.]" *Id.* at 6. "For the Court to transfer this action at the current stage in litigation would further exacerbate [X Corp.'s] prejudice." *Id.*

**b.)** Back in December 2023, and about a week after X Corp. sued in Texas, TIUC brought Irish-law defamation and malicious-falsehood claims against Media Matters in the High Court of Ireland. 4-ER-606; *see also* 2-ER-136; 3-ER-330. In January 2024, Media Matters entered a conditional appearance and expressed an intent to challenge the court's jurisdiction on *forum non conveniens* grounds. 4-ER-606. As Media Matters' counsel later explained, Media Matters intentionally chose to emphasize *forum non conveniens* instead of pressing an argument based on the forum-selection clause in X Corp.'s (but not TIUC's) terms of service because of "a considered decision to make the best arguments … geared to th[at] particular jurisdiction[]." 4-ER-709. And, if anything, that candid admission undersold things. Media Matters was plainly aware of the forum-selection clause, as—just as in the Texas case—it adverted to the terms of service multiple times in the Irish litigation. *See* 4-ER-610-11. Yet, also just as is in the Texas litigation, Media Matters chose not to press the clause as a basis for dismissal or transfer in the Irish case.

Media Matters spent the next several months putting its *forum non conveniens* motion together, ultimately filing in June 2024. 4-ER-607. TIUC filed responsive papers, including multiple expert reports and factual affidavits, in December 2024, in compliance with the schedule the parties originally set. 4-ER-608. Media Matters

was then supposed to file its replying papers in early February 2025, and the motion would be listed before the court later that month. 4-ER-608. But Media Matters ended up taking several extra weeks to file its reply, causing the High Court to relist the motion again, this time for March 12, 2025. 4-ER-609.

**c.)** Around the same time TIUC initiated the Ireland litigation, TAP sent a letter putting Media Matters on notice that its defamatory coverage was causing distinct harm to TAP's Asian advertising base. 3-ER-327. Several months later, in July 2024, TAP filed suit in the General Division of the High Court of the Republic of Singapore raising defamation claims under Singapore law. 2-ER-79. After several months of preliminary motions, Media Matters filed materials supporting a motion to dismiss on *forum non conveniens* grounds in November 2024. 4-ER-598-99. As in the Irish litigation, Media Matters once again made a considered decision not to press a challenge predicated on X Corp.'s terms of service. *See* 4-ER-602 (noting that Media Matters twice "refer[red] to the X [Corp.] terms of service" without "argu[ing that] the forum selection [clause] was binding" on TAP). TAP responded in December 2024. 4-ER-598-99. At that point, Media Matters sought leave to file a reply, which the trial court denied. 4-ER-599-600. Media Matters took an interlocutory appeal of that order, and after argument, the appellate court ultimately allowed both sides to file additional briefs. 4-ER-600-01. On remand,

the trial court held a scheduling conference and set a hearing on Media Matters'
*forum non conveniens* motion for April 14, 2025. 4-ER-601.

### C. Procedural History

1. Sixteen months into the Texas and Ireland litigation, and eight months into
the Singapore litigation, Media Matters, Carusone, and Hananoki filed this case
against X Corp., TIUC, and TAP in the Northern District of California on March 10,
2025. That forum choice was a stretch. Plaintiffs lack any connection to California:
Media Matters is incorporated and does business in Washington, D.C., and Carusone
and Hananoki both live and work in the D.C. area. 2-ER-14-15. And while the
forum-selection clause in the X Corp. terms of service *previously* called for disputes
to be brought in California, X Corp. subsequently revised its terms of service—four
months *before* Plaintiffs filed their complaint in this case—to update the forum-
selection clause to reflect the corporation's move to Texas. *See* n.2, *supra*. That
said, the timing of Plaintiffs' lawsuit here was not an accident: Plaintiffs filed this
case not long after they lost their motion to dismiss in Texas, roughly a month before
their next Singapore hearing, and just *two days* before their next Ireland court date
was scheduled.

Plaintiffs allege that Elon Musk engaged in a "globetrotting litigation
campaign against Media Matters" "as part of a global campaign of intimidation." 2-
ER-12-13. Contending that "campaign" involving suits filed by three separate

16

entities violated the forum-selection clause appearing only in X Corp.'s *old* terms of service, Plaintiffs seek damages for breach of contract. 2-ER-46. And now, despite asserting entitlement to damages for that breach, Plaintiffs seek declaratory and injunctive relief barring X Corp., TIUC, and TAP from prosecuting their respective litigations and from filing any additional litigation in any other fora. 2-ER-46.

The complaint takes various tacks to shoehorn TIUC and TAP into X Corp.'s terms of service, from claiming that "they are third party beneficiaries" of X Corp.'s old terms of service, 2-ER-16, to arguing that "they are alter egos of X [Corp.]," 2-ER-17-18. But the complaint never alleges that Media Matters or Carusone ever had an X account or that either it or he ever agreed to X Corp.'s terms of service. Likewise, while the complaint alleges that Hananoki has a contractual right to litigate in the Northern District of California (because he has an X account), *e.g.*, 2-ER-9, it elides any mention of the updated forum-selection clause in the updated terms of service, to which Hananoki later assented, that requires litigation in Texas. Finally, the complaint invokes the district court's diversity jurisdiction by claiming that "the amount in controversy exceeds $75,000," 2-ER-15, without acknowledging (or even challenging) the terms of service's $100 limitation-of-liability provision.

2. The day after filing the complaint, Plaintiffs filed a motion seeking to "enjoin[] Defendants from further prosecuting their pending actions against Media Matters in jurisdictions outside of the United States" and to "enjoin[] X Corp.,

17

whether directly or through its subsidiaries, from prosecuting or initiating litigation against Media Matters arising from the same conduct alleged in the Ireland and Singapore complaints in jurisdictions outside the United States." 2-ER-167. This motion immediately disrupted the scheduling plans of foreign courts, starting with the High Court of Ireland, which scrapped its planned March 12 conference at the last minute and, following the best traditions of comity, adjourned a court date for Media Matters' *forum non conveniens* motion indefinitely "to allow TIUC time to consider the impact of the California proceedings." 4-ER-610.

3. X Corp.'s response to Plaintiffs' eleventh-hour lawsuit was straightforward: In addition to opposing Media Matters' preliminary-injunction motion, it informed Media Matters that it intended to file a motion in the Northern District of Texas litigation, arguing that any challenge to the applicability of the forum-selection clause should be brought there, where litigation between the parties had been underway for well over a year. In a remarkable gambit, however, Plaintiffs rushed to the California court with a separate application for a temporary restraining order, requesting that the court prohibit X Corp. from filing its proposed motion in Texas and claiming that urgent *ex parte* relief was necessary to shield them from having to explain their decision to file in California. 3-ER-446.

The district court properly declined to issue a temporary restraining order. Noting that Media Matters waited "[a]bout a year" to file its California challenge,

18

the district court expressed its own doubts about whether "Media Matters forfeited its right to assert the forum selection clause … by waiting so long to file." 1-ER-5-6. But, at bottom, the district court correctly refused "to take the drastic step of issuing an order that would effectively prevent another federal district court from ruling on a motion pending before it." 1-ER-5. (As noted, Judge O'Connor subsequently denied Media Matters' motion in the Texas case, finding that it waived reliance on the forum-selection clause by failing to raise it for over a year, despite having invoked the clause in its papers. *See* pp.12-14, *supra*.)

4. Yet when it came time to decide the original preliminary-injunction motion, the district court declined to extend the same courtesy to the High Court of Ireland. In a breezy two-page order that did not address any of Appellants' jurisdictional arguments or explain how Plaintiffs could satisfy the preliminary-injunction factors despite never having argued that they stood to suffer irreparable injury, the court granted an extraordinary anti-suit injunction blocking the Irish court from ruling on Media Matters' year-old *forum non conveniens* motion. 1-ER-3.

At the same time, the court curiously (but correctly) refused to enjoin the more-recently-initiated Singapore proceedings, on the grounds that the Singapore "parties have filed their briefs and the matter is set for hearing in just a few days." 1-ER-3. Contending (erroneously) that "the parties haven't filed their briefs" in the Irish case and (equally erroneously) that "the matter hasn't been set for hearing," the

court perfunctorily decreed that disrupting the Ireland proceedings would have less "impact on comity." 1-ER-3. And despite again recognizing Media Matters' "significant" "delay in bringing this case and invoking the forum selection clause," this time the district court excused the delay based on its (erroneous) belief that Media Matters had "fail[ed] to raise the forum selection clause earlier" only because counsel "simply missed th[e] issue." 1-ER-2-3.

That belief is impossible to square with Media Matters' frank representation *to the same judge* just a day earlier at oral argument that it made the "considered decision" not to press the forum-selection clause "[i]n the foreign actions." 4-ER-709. Indeed, Media Matters' waiver came up several times during the hearing. As Appellants' counsel pointed out, Media Matters' motion to dismiss the Texas case explicitly "refer[red] to" the Northern District of California "as X's preferred choice of forum … because of the then-existing terms of service at the time." 4-ER-726. And while Appellants' counsel acknowledged that "[n]ew counsel, new theory," was one possible explanation for Media Matters' extreme delay in asserting the forum-selection clause, he went on to suggest that an equally plausible reason was that Media Matters did not "like how litigation is going in Texas" and, "90 days from the end of discovery, … thr[e]w[] a Hail Mary." 4-ER-734-35. Nevertheless, the district court brushed all that aside, (mis)labeling an explicit waiver a mere forfeiture.

The district court acknowledged in its two-page order that it was leaving important questions unanswered. But it acted with alacrity based on its unelaborated belief that "the X entities' decision to file multiple suits in multiple jurisdictions is designed more to bully Media Matters and inflict financial hardship upon it than to actually vindicate those entities' rights." 1-ER-2. That belief is contradicted, of course, by the decision denying Media Matters' motion to dismiss the Texas case and finding X Corp's claims plausible. *See X Corp.*, 2024 WL 4001803, at *6-8.

The district court ended its abridged order by providing what to date has been an unfulfilled promise—namely, that it would issue "[a] longer order explaining the Court's reasoning in more detail (for example, why this dispute clearly falls within the scope of the forum selection clause and why the foreign subsidiaries are bound by it)." 1-ER-3. As of this brief going to press, however, the court has provided no additional explanation into the reasoning behind its extraordinary anti-suit injunction.[4]

5. This appeal followed. 4-ER-764.[5]

---

[4] During the pendency of the preliminary-injunction proceedings, X Corp., TIUC, and TAP also filed a motion to dismiss or to transfer to the Northern District of Texas; the motion is fully briefed and ripe for decision. 4-ER-778-79.

[5] Appellants also promptly moved the district court to stay its anti-suit injunction, 4-ER-779; their motion remains outstanding.

## SUMMARY OF ARGUMENT

**I.** Although the district court promised an opinion would follow shortly after it hastily enjoined TIUC, an Irish-domiciled corporation, from continuing to litigate an Irish-law case that has been pending in Irish court since 2023, it has yet to issue one. That delay may be occasioned by the difficulty in explaining how X Corp.'s forum-selection clause bars TIUC from proceeding in its home jurisdiction. But whatever the reason for the ongoing absence of an opinion, this Court should "vacate and remand" at the very least, "[b]ecause the district court did not issue a clear ruling regarding the anti-suit injunction or provide a more robust explanation for its decision." *Citigroup*, 830 F.App'x at 242 (so ordering).

**II.** That said, this Court should go further and reverse and make clear that the litigation pending in Ireland should proceed apace, because the one thing that is crystal clear from the two-page order is that it "rest[s] upon an erroneous view of the law" and "a clearly erroneous view of the facts." *Microsoft*, 696 F.3d at 889. To the extent any court should be considering Media Matters' radically tardy invocation of X Corp.'s forum-selection clause, it should be the High Court of Ireland.

The district court began by recognizing that "Media Matters's delay in bringing this case and invoking the forum selection clause is relevant to" its request for a foreign anti-suit injunction. 1-ER-2. So far, so good. At a minimum, Media Matters should have explained its delay to the Irish court, but in reality traditional

equitable doctrines like waiver and laches should have precluded relief in U.S. courts altogether. Instead, the district court excused Media Matters' delay in raising the issue on the theory "that previous counsel for Media Matters simply missed this issue, and when new counsel came in, they spotted it and acted on it right away" by seeking an anti-suit injunction. 1-ER-2-3.

Failing to issue-spot for 18 months is not remotely a legally relevant excuse for not invoking a forum-selection clause much sooner. Because parties are charged with constructive knowledge of documents they sign, *see Consol. Edison Co. v. United States*, 221 F.3d 364, 371 (2d Cir. 2000) (collecting cases), a party waives a contractual right even when its counsel "simply misse[s]" it, *contra* 1-ER-2-3. Even more problematic, the district court's "I-just-missed-it" narrative was contrary to Media Matters' candid admission *to the same judge* that it made "a considered decision" not to invoke the forum-selection clause in the foreign cases and instead to rely solely on "forum non conveniens" in those proceedings. 4-ER-709; *see also* 4-ER-726, 734-35. Indeed, Media Matters did the same thing in the foreign litigation that it did in Texas where, as Judge O'Connor recently held, Media Matters waived the forum-selection clause by litigating other issues *for 18 months* without invoking the clause directly, despite citing the clause in its briefing. But even putting the Texas waiver aside, Media Matters' admission about its strategic decision not to press the forum-selection-clause argument "[i]n the foreign actions," 4-ER-709,

eliminates the factual basis for this extraordinary anti-suit injunction. It would be "'an abuse of discretion' for [the district] court 'to override'" that waiver even in a more mundane context. *Wood*, 566 U.S. at 472-73. To disregard such a waiver in order to issue an extraordinary injunction against foreign proceedings filed 18 months earlier is a truly remarkable abuse of discretion.

The district court attempted to justify that extraordinary interference—and to distinguish the un-enjoined Singapore litigation that had been pending for only about one-third as long—by claiming that "the parties" in Ireland "haven't filed their briefs on Media Matters's jurisdictional challenge" there, but "in the Singapore case, the parties have filed their briefs and the matter is set for hearing in just a few days." 1-ER-3. In reality, however, the parties in the Ireland case spent a year litigating Media Matters' *forum non conveniens* motion, which caused TIUC to expend considerable time and money. And Media Matters sought this preliminary anti-suit injunction *literally the day before* that motion was listed before the High Court of Ireland. *See* 4-ER-607-08. Indeed, the mere filing of this motion was enough to cause the High Court of Ireland to scuttle that scheduled hearing. 4-ER-610. To state what should be obvious, the fact that the Irish judiciary was willing to pay due respect to the Northern District of California cannot be a valid basis for the latter's utter failure to pay any respect to the former, especially when proceedings in the Irish court are exponentially farther along.

**III.** While this Court can and should reverse because the (few) stated bases for the order were erroneous, the problems with the order do not end there. Notwithstanding Media Matters' crystal clear waiver and laches, the district court granted relief "with regard to the Ireland proceeding" based on its belief that the *Gallo* factors "strongly favor[] Media Matters," without even so much as mentioning the other equitable factors or (worse yet) wrestling with the multiple reasons why jurisdiction is lacking and venue is improper. 1-ER-2.

As to jurisdiction, Media Matters and Carusone fail to adequately allege Article III standing, because they seek to enforce X Corp.'s now-superseded forum-selection clause against TIUC (which was never a party to X Corp.'s terms of service and has never sought to enforce them), without alleging that they were parties to X Corp.'s terms of service at any point. And because all Plaintiffs seek to offensively wield the terms of service's forum-selection clause, equitable estoppel "precludes" them from "simultaneously attempting to avoid" the clause limiting damages to $100, *Comer v. Micor, Inc.*, 436 F.3d 1098, 1101 (9th Cir. 2006), which is $74,900 short of 28 U.S.C. §1332's amount-in-controversy requirement.

Jurisdictional defects aside, the Northern District of California is still the wrong venue. This suit should be transferred to the Northern District of Texas, where the parties have been litigating for more than a year and a half, where the X Corp. terms of service in effect at the time Plaintiffs filed this lawsuit point, and where the

25

court recently concluded that Media Matters waived reliance on any forum-selection clause, despite making other arguments about the terms of service.

Furthermore, the district court's *Gallo* analysis was demonstrably flawed. On the first, threshold factor—whether Media Matters' attempt to invoke the old forum-selection clause in X Corp.'s old terms of service "is dispositive of the action to be enjoined," 446 F.3d at 991—the answer is plainly no. The district court concluded otherwise, apparently because (it thought) TIUC is a "third-party beneficiar[y] of [X Corp.'s] Terms of Service." 1-ER-2. But that is wrong factually, which means there is no personal jurisdiction over TIUC. And it is wrong legally, as "[a] third party beneficiary … certainly cannot be *bound* to a contract it did not sign or otherwise assent to." *Comer*, 436 F.3d at 1102. That would seem particularly clear with a forum-selection clause that would be in derogation of TIUC's ability to sue in its home forum. The *Gallo* analysis thus begins and ends here at the threshold.

Finally, Media Matters' wholesale failure to carry its burden to show irreparable harm or that the balance of equities and the public interest favor an extraordinary foreign anti-suit injunction supply an independent reason to reverse. There is no irreparable injury here, because Irish law gives Media Matters a *prima facie* entitlement to recover its legal fees if it prevails. The equities do not favor Media Matters for the reasons already explained—i.e., waiver and laches. Those waiver and laches issues apply with particular force to a belatedly asserted forum-

selection clause, since the usual justification for specific performance of such a clause presupposes a timely invocation. And last but certainly not least, the district court's manifest disregard for the Irish judicial system undermines the mutual respect for coordinate sovereigns on which comity depends and that Article III courts expect (and sometimes demand) when roles are reversed.

## STANDARD OF REVIEW

Foreign anti-suit injunctions "present[] particularly complex legal issues, especially because of international comity concerns." *Gallo*, 446 F.3d at 989. "Although" this Court's "overall review is for an abuse of discretion, '[t]he district court's interpretation of the underlying legal principles … is subject to de novo review and a district court abuses its discretion when it makes an error of law.'" *Id.* (alterations and omission original). A district court also abuses its discretion when it "base[s] its decision … on clearly erroneous findings of fact." *Id.*; *see also Microsoft*, 696 F.3d at 881. Finally, when a plaintiff seeks a preliminary (as opposed to a permanent) foreign anti-suit injunction, courts should consider not just the three-part *Gallo* test and standard equitable principles, but also whether the plaintiff carried its burden to establish that it "will likely suffer irreparable harm in the absence of preliminary relief," "that the balance of equities tip[s] in its favor," and "that the public interest favors an injunction." *Wells Fargo & Co. v. ABD Ins. & Fin. Servs., Inc.*, 758 F.3d 1069, 1071 (9th Cir. 2014).

# ARGUMENT

## I. At The Absolute Least, The District Court's Failure To Issue An Opinion Addressing The Relevant Considerations Requires Vacatur.

When a district court fails "to issue a final order on [a] request for an anti-suit injunction," this Court does not hesitate to "vacate and remand" for the court "to provide a more complete explanation of the reasons behind its ruling." *Citigroup*, 830 F.App'x at 242. That is not only because Rule 65(d)(1)(A) requires "[e]very order granting an injunction" to "state the reasons why it issued." Fed. R. Civ. P. 65(d)(1)(A); *see, e.g.*, *Diouf v. Mukasey*, 542 F.3d 1222, 1235 n.7 (9th Cir. 2008). It is also because when there is a question about whether "the district court's exercise of discretion was based on consideration of the relevant factors," this Court simply "cannot review the decision 'for abuse of discretion without [the] benefit of the lower court's reason for deciding as it did.'" *Ins. Co. of N. Am. v. Moore*, 783 F.2d 1326, 1328 (9th Cir. 1986). "A mere parroting of the [legal standard] is not an adequate substitute for a full statement of reasons." *United States v. Wheeler*, 795 F.2d 839, 841 (9th Cir. 1986).

Yet that is all we have here. The district court forthrightly admitted that its order elided important aspects of the analysis, *see* 1-ER-3, and the order did not breathe a word about the preliminary-injunction factors (or, for that matter, Appellants' threshold arguments). Those are fatal omissions. *See, e.g.*, *Citigroup*, 830 F.App'x at 242; *see also hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180, 1188

28

(9th Cir. 2022) ("The grant of a preliminary injunction constitutes an abuse of discretion if the district court's evaluation … is … 'without support in the record.'").

And even if the district court ends up issuing an opinion during the pendency of this appeal, that would not cure the problem. Appellants here have been forced to file an opening brief in this Court without fully "know[ing] on which horn [they are] caught." *Sowards v. United States*, 411 F.2d 787, 788 (9th Cir. 1969); *see also Military Audit Proj. v. Casey*, 656 F.2d 724, 734 (D.C. Cir. 1981) (appellants who do "not know the basis for the decision of the district court" are "le[ft] … in a position from which it [is] difficult intelligently to argue an appeal"); *Virginian Ry. Co. v. United States*, 272 U.S. 658, 674-75 (1926) (reversing lower-court equitable order for "the absence of an opinion").

Moving targets should not be affirmed in any context—and especially not when they involve one of the most extraordinary and consequential equitable powers in the federal courts' toolkit. This Court can summarily vacate for this reason alone.

## II.   The Stated Reasons For The Injunction Are Demonstrably Wrong.

The district court did not say much in its two-page order. But what little it did say leaves no doubt that the injunction "rest[s] upon an erroneous view of the law" and "a clearly erroneous view of the facts." *Microsoft*, 696 F.3d at 889.

**A.** To the extent the order offered any legal analysis at all, it was deeply flawed. To its credit, the court at least recognized that the *Gallo* factors operate

against the background of traditional equitable principles—and thus that "Media Matters's delay in bringing this case and invoking the forum selection clause is relevant to all the relief it seeks." 1-ER-2. But when it came to determining the relevance of the delay, the district court lost the plot.

Counsel for Media Matters affirmatively represented at a hearing the day before the order came down that Media Matters' foreign counsel made "a considered decision" not to invoke the forum-selection clause "[i]n the foreign actions" and instead to rely solely on "forum non conveniens," based on their judgment about which arguments were most likely to succeed. 4-ER-709; *see also* p.20, *supra*. That frank admission should have been the beginning and the end of Plaintiffs' extraordinary request. After all, a "considered decision" not to invoke a forum-selection clause constitutes a waiver, which federal courts may not lightly disregard. And if Media Matters wanted to try to explain its change of heart to any court, it should have been the Irish court, which would be in the ideal position to evaluate the reversal in position and consider the equities, including its own wasted efforts.

Undeterred, the district court somehow transformed Media Matters' candid admission overnight from a "considered decision" to mere (inexcusable) incompetence. In its order, the court (mis)stated that "it appears that previous counsel for Media Matters simply missed this issue, and when new counsel came in, they spotted it and acted on it right away." 1-ER-2-3. The court did not substantiate

that admission-defying finding with any record support. Nor did it provide any legal support for its ultimate conclusion that even a failure to issue-spot for 18 months—as opposed to a "considered decision" not to raise the issue—somehow justifies an extraordinary injunction of foreign proceedings. That is likely because nothing could justify it. In excusing Media Matters' conscious waiver, the district court stood both the facts and traditional equitable principles upside down.

1. First, making "a considered decision," 4-ER-709, to not raise a claim in a foreign suit that logically should be raised at the very outset of the proceedings is classic waiver. *Morgan v. Sundance*, 596 U.S. 411, 417 (2022). And when a litigant "intentionally jettison[s]" a right to arbitrate or litigate elsewhere in lieu of trying their hand with some preliminary motion only to have a change of heart, courts flatly "refuse to consider" it. *Bannister v. Knox Cnty. Bd. of Educ.*, 49 F.4th 1000, 1111 (6th Cir. 2022) (collecting cases). Judge O'Connor recently gave effect to that commonsense point in the Texas litigation, holding that Media Matters' failure to raise the forum-selection clause as a basis for transfer, despite its having cited the clause in seeking to dismiss that case on other grounds, was classic waiver in derogation of the forum-selection clause that severely prejudiced X Corp. N.D.Tex.Order.5-9; *see* pp.12-14, *supra*. The court here should have held the same.

To the extent the district court deemed it unfair to hold Media Matters accountable for what it believed to be its prior counsel's poor judgment, that simply

does not wash. It is always "'an abuse of discretion' for a court 'to override a [party's] deliberate waiver.'" *Wood*, 566 U.S. at 472-73; *see, e.g.*, *Coleman v. Thompson*, 501 U.S. 722, 752-54 (1991) (enforcing procedural-default rule against habeas petitioner even when it was a result of attorney error). After all, "our system 'is designed around the premise that [parties represented by competent counsel] know what is best for them, and are responsible for advancing the facts and argument entitling them to relief.'" *United States v. Sineneng-Smith*, 590 U.S. 371, 375-76 (2020) (alteration in original). And that principle applies *a fortiori* when the party that waived an issue did so not only in a federal court in Texas, but also in a foreign court (despite having raised related issues), and now is asking its waiver to be excused so that it can secure an anti-suit injunction against foreign proceedings that have been proceeding apace for more than 18 months. Just as the district court recognized when it denied Media Matters' request for a TRO preventing Judge O'Connor from adjudicating Media Matters' waiver in the Texas case (but apparently then forgot when it came to the preliminary injunction), the court best positioned to consider whether Media Matters should be able to invoke a forum-selection clause 18 months into the Irish case is self-evidently the Irish court.

Perhaps the district court believed that a party cannot waive a contract's forum-selection clause unless they actually know about the clause (although, again, it is unclear precisely what the district court thought). That would be wrong too. As

a matter of fact, we know that Media Matters was aware of the forum-selection clause.  Media Matters cited the clause in its motion to dismiss the Texas action (though, as Judge O'Connor noted, Media Matters notably declined to invoke it as a basis for transfer or *forum non conveniens*).  *See* N.D.Tex.Order.5-7; *see also* 4-ER-734-35; pp.12-14, *supra*.  Media Matters likewise cited the clause in its papers in both the Irish and Singapore cases.  *See* 4-ER-602, 610-11.  Counsel's frank admission below that it was a strategic choice not to press the forum-selection clause in those cases was not a slip of the tongue; it was the only thing counsel could say.  What is more, hornbook contract law teaches that "[w]aiver of a contract provision may be made by a party's express declaration, or it may be implied from representations that fall short of an express declaration of waiver, as well as from the parties' conduct and acts and circumstances surrounding performance."  Williston on Contracts §39:27 (4th ed. 2024) ("Williston"); *see also* Restatement (Second) of Contract §84 cmt.b (Am. Law. Inst. 2024) ("The common definition of waiver" "as 'the voluntary relinquishment of a known right'" "may lead to the *incorrect* inference that the promisor must know his legal rights" to forfeit them. (emphasis added)).  At bottom, Media Matters made an express admission of waiver here.  *See* 4-ER-709.  But even if it had not, there is still more than enough to find a waiver in the Irish case (and the Singapore case), no less than Judge O'Connor held in Texas.

*Schwebke v. United Wholesale Mortgage LLC*, 96 F.4th 971 (6th Cir. 2024), is on all fours. The defendant "failed to raise" a contractual right for the first "six-and-a-half months" of litigation, solely because of attorney oversight; counsel literally "told the district court that [the defendant] had not raised the arbitration clause earlier 'because [*counsel*] didn't know there was an arbitration clause'" in the first place. *Id.* at 973, 975. But that stunning "mistake d[id] not prevent [the court] from finding waiver" based on the defendant's inconsistent conduct in the litigation. *Id.* at 977. And just so. Because parties are charged with constructive knowledge of documents they sign, *see Consol. Edison*, 221 F.3d at 371 (collecting cases), acting "inconsistently" with a contractual right can amount to a knowing and intelligent waiver even without actual knowledge of the right. Williston §§39:28, 39:30.

2. Even if the district court could ignore the admission/waiver, and even if it were correct that the forum-selection clause was overlooked, all that would mean is that there was a forfeiture, not waiver. But a forfeiture would be equally fatal. Forfeiture—which applies when a party "unintentionally" "fails to timely assert a claim," *Bannister*, 49 F.4th at 1111—can only be excused when there are "exceptional circumstances why the issue was not raised" earlier, *Allen v. Ornoski*, 435 F.3d 946, 960 (9th Cir. 2006). Media Matters points to none. Indeed, the only circumstances here that are exceptional point in the opposite direction: The supposed forfeiture (but really, waiver) occurred in a foreign proceeding in which

34

Media Matters has acknowledged the forum-selection clause's existence but chosen not to press an argument based on it at any point during the now-18-plus months of active litigation. *See* 4-ER-610-11; *see also* 4-ER-602 (same in Singapore).

Appellants are not aware of any case in any comparable setting in which a court has excused such a glaring forfeiture. That is unsurprising: The idea that a U.S. court would enjoin foreign proceedings, rather than direct Media Matters to "tell it to the judges" that have been presiding over the matter for 18 months, is antithetical to bedrock principles of equity and comity.

3. Indeed, the problems extend beyond waiver and forfeiture to laches. "Laches is an equitable defense that prevents a plaintiff, who 'with full knowledge of the facts, acquiesces in a transaction and sleeps upon his rights.'" *Danjaq LLC v. Sony Corp.*, 263 F.3d 942, 951 (9th Cir. 2001). "It must be obvious to every one familiar with equitable principles that it is inequitable for the owner of a [right], with full notice of [its] intended infringement, to stand inactive while the proposed infringer spends large sums of [its own] money," delaying intervention as a way to maximize financial harm to the infringer. *Id.* (quoting *Haas v. Leo Feist, Inc.*, 234 F. 105, 108 (S.D.N.Y. 1916) (L. Hand, J.)).

"To establish laches a defendant must prove both an unreasonable delay by the plaintiff and prejudice to itself." *Couveau v. Am. Airlines, Inc.*, 218 F.3d 1078, 1083 (9th Cir. 2000). Both are present in spades here. Media Matters has been

litigating claims arising out of its manipulation of the X platform and subsequent defamation in Ireland and Texas since 2023 and Singapore since mid-2024; in each of those cases, Media Matters has contested jurisdiction and even cited the terms of services containing the clause. *See* pp.12, 14-15, *supra*. Yet not once before it filed this lawsuit in March of 2025 did Media Matters even so much as hint that it thought a contractual provision (in the X Corp., but not TIUC, terms of service) required all of those claims to be heard in California. That is the definition of unreasonable delay, especially since Media Matters is hardly an unsophisticated party operating without the assistance of counsel. And Media Matters' delay has unquestionably redounded to its benefit. Merely filing this lawsuit led the High Court of Ireland to push off a scheduled court date indefinitely, *see* p.18, *supra*, and since then Media Matters has succeeded in shutting that litigation down indefinitely. This case is the poster child for laches, and the last case in which equity supports an anti-suit injunction. The district court's contrary conclusion rests on a demonstrably invalid view of the law.

**B.** The order ignored the dramatic impact on the long-filed Irish litigation based on a clearly erroneous view of the facts of that litigation. The lynchpin of the district court's decision to enjoin further proceedings in the Ireland litigation was its factual finding that "the parties" in the Ireland litigation "haven't filed their briefs

on Media Matters's jurisdictional challenge" and that "the matter hasn't been set for hearing." 1-ER-3. Those findings were clearly erroneous.

TIUC's lawsuit against Media Matters has been pending in Irish court since December 2023. 4-ER-606. From the beginning, Media Matters has argued that it should not have to litigate TIUC's claims in Ireland—but it has *not* premised its argument on the forum-selection clause in the contract involving only X Corp., and not TIUC. "On 18 January 2024, Arthur Cox LLP, on behalf of Media Matters in the Irish Proceedings, entered a Conditional Appearance on behalf of [Media Matters] for the purpose of contesting the forum and jurisdiction of the Irish Courts to hear the proceedings." 4-ER-606. Consistent with that initial filing, Media Matters later filed its motion challenging the power of the Irish court to hear the case. "On 17 June 2024, Media Matters issued an application" in the Ireland case "by way of Notice of Motion returnable to 21 October 2024" seeking "an Order … dismissing or staying the proceedings, in whole or in part, … on the grounds of forum non conveniens." 4-ER-607. TIUC diligently opposed Media Matters' motion, filing multiple expert reports and factual affidavits responding to Media Matters' challenge to the Irish court's jurisdiction, and exchanging a flurry of counsel-to-counsel correspondence. 4-ER-608.

While TIUC has not yet filed its legal brief in the Irish case, that is no help to Media Matters. Briefing in Ireland proceeds in two stages—first, the parties submit

extensive briefing on the facts (and, here, exchange multiple expert-witness reports), before moving into a second round of briefing on the law. Here, the parties were almost done with all scheduled factual briefing and ready to proceed to legal briefing—indeed, the main reason the parties had not already proceeded to legal briefing is that Media Matters delayed. Factual briefing was initially scheduled to conclude months ago, and the High Court of Ireland had initially resolved to list the motion before the court well in advance of when Plaintiffs filed this lawsuit. 4-ER-608. But Media Matters repeatedly stalled, asking for extension upon extension in what it is now clear was a not-so-subtle attempt to drag out that case in anticipation of seeking emergency relief here. *See* 4-ER-608-09. And that pattern of delay may explain, but by no means justifies, why Media Matters did not try to belatedly raise the forum-selection clause argument before the Irish High Court. Indeed, the current round of proceedings on Media Matters' challenge to the Irish court's jurisdiction closed the day *before* Plaintiffs filed their preliminary-injunction motion, 4-ER-609, and the matter was listed for the High Court of Ireland for the day *after*, but the Irish court postponed that court date out of respect for the California proceedings, 4-ER-610.

The upshot is that, contrary to the district court's apparent (mis)understanding, TIUC and Media Matters have very much been actively litigating Media Matters' challenge to the Irish court's jurisdiction for nearly a year now. Perhaps the district

court was confused by the fact that the procedural ins and outs of litigating in Ireland are different than under the Federal Rules of Civil Procedure. But that only underscores the importance of international comity, as the Irish court would have understood the exact status of the proceedings—and whether Media Matters' eleventh-hour invocation of the forum-selection clause is consistent with its litigation conduct to date. In all events, regardless of what contributed to the court's error, the important point is that the district court clearly erred.

That error begat further errors and bases for reversal. This Court routinely observes that "arbitrary" or "irrational" decisions constitute "an abuse of discretion." *E.g.*, *Aguilar Fermin v. Barr*, 958 F.3d 887, 892 (9th Cir. 2020). One thing the district court got right was declining to enjoin TAP's lawsuit in Singapore. *See* 1-ER-3; p.19, *supra*. But the singular basis on which the court distinguished the Ireland and Singapore cases is, once again, clearly incorrect.

Although the court began its order by noting that "Media Matters's delay in bringing this case and invoking the forum selection clause is relevant to all the relief it seeks," it reasoned that "the delay matters more with regard to the request to enjoin the Singapore case" because the parties there "have filed their briefs and the matter is set for hearing in just a few days," which meant that they had "presumably spent a lot of time and money litigating the challenge—and more importantly, the Singapore court has presumably spent a lot of time and effort preparing to hear it."

1-ER-2-3.  But all of that is equally, if not more, true of the Irish case.  The Irish case has been pending considerably longer (since December 2023) than the Singapore case (which did not actually begin until July 2024).  *See* pp.14-15, *supra*.  And if the amount "of time and money" "spent … litigating the challenge" provides a reason to enjoin the Singapore litigation, 1-ER-3, which it obviously does, *see supra*, then the district court's stated reason for declining to enjoin the Singapore case should apply *a fortiori* to the Ireland case.  As explained, TIUC has spent considerable resources responding to Media Matters' jurisdictional challenge in Ireland.  *See, e.g.*, 4-ER-608 ("TIUC[] filed replying affidavits in accordance with the agreed timetable").  Indeed, it has spent *more* time and money on the Irish case.

To be sure, the Singapore litigation was on the precipice of a hearing when the district court decided the preliminary-injunction motion, whereas the High Court of Ireland had already put off its previously scheduled hearing by the time the district court here heard oral argument on the motion for a preliminary injunction.  *See* p.18, *supra*.  But that is hardly a reason to give the Irish court *less* solicitude.  After all, the Irish court delayed the court date on Media Matters' *forum non conveniens* challenge at Media Matters' request, and then took it off the calendar *because Media Matters filed this motion* on the eve of the rescheduled court date.  *See* 4-ER-609-10; pp.14-15, 18, *supra*.  The Ireland court thus acted consistent with the best traditions of comity.  Holding that against it blatantly offends comity while

40

rewarding Media Matters for strategically seeking an injunction so late that disrupting the Ireland hearing was a *fait accompli*.

At bottom, the district court treated two pending foreign cases differently, even though the cases are materially identical. And it reserved the worst treatment for the one that had been pending the longest and that had showed the most respect for the proceedings here. Worse yet, the record clearly contradicts the only explanation offered for that disparate treatment. Enjoining the Ireland litigation was arbitrary in the extreme. It is difficult to imagine a more obvious abuse of discretion.

## III. There Are Multiple Additional Reasons Why It Was A Manifest Abuse Of Discretion To Issue This Preliminary Anti-Suit Injunction.

While this Court can and should reverse because the (handful of) stated bases for the district court's order were erroneous, those are far from the only reasons to reverse. Notwithstanding Media Matters' crystal clear waiver and laches, the district court granted relief "with regard to the Ireland proceeding" based on its apparent belief that the *Gallo* factors "strongly favor[] Media Matters," without even so much as mentioning the other equitable factors or (worse yet) wrestling with the multiple reasons why jurisdiction is lacking and venue is improper. 1-ER-2.

### A. The District Court Lacks Subject-Matter Jurisdiction.

1. Federal law is clear: Subject-matter jurisdiction based on diversity of citizenship requires a good-faith claim that "the matter in controversy exceeds the sum or value of $75,000, exclusive of interests and costs." 28 U.S.C. §1332; *see St.*

*Paul Mercury Indem. Co. v. Red Cab Co.*, 303 U.S. 283, 288-89 (1938). So "when the terms of a contract" include a "limitation of damages … mak[ing] it virtually impossible for a [§1332] plaintiff to meet the amount-in-controversy requirement," courts must dismiss for lack of subject-matter jurisdiction. *Pachinger v. MGM Grande Hotel-Las Vegas, Inc.*, 802 F.2d 362, 364 (9th Cir. 1986); *see, e.g.*, *Binns v. Am. Gen. Life & Accident Ins. Co.*, 2023 WL 5125042, at *1 (9th Cir. 2023) (breach-of-contract plaintiff "failed to establish diversity jurisdiction" because the contract "limited recovery" to "$1,000"); *Slater v. O'Brien's Moving and Storage, Inc.*, 931 F.2d 61, at *1-2 (9th Cir. 1991) (affirming dismissal for lack of diversity jurisdiction because "the terms of the contract" limited damages "to $300"); *Valhal Corp. v. Sullivan Assocs., Inc.*, 44 F.3d 195, 209 (3d Cir. 1995) (similar).

That aptly describes this case: Even assuming consequential damages are available—and they are not[6]—Plaintiffs' request for consequential "damages in the amount of … millions of dollars" spent litigating abroad, 2-ER-15, runs headlong into provisions in X Corp.'s terms of service limiting its "aggregate liability" for

---

[6] Media Matters cannot claim consequential damages for amounts expended abroad, both because Media Matters is not protected by the forum-selection clause and because TIUC and TAP were not bound by it. And in all events, Carusone and Hananoki cannot seek consequential damages for the additional reason that they are not parties to any foreign litigation. *Cf.* 2-ER-78; 3-ER-329. Moreover, if consequential damages *were* available, then that adequate remedy at law would be one more strike against the extraordinary equitable relief ordered here.

"consequential … damages" to "the greater of $100 USD or the amount you paid us, if any, in the past six months," regardless of the "theory of liability," 2-ER-50, 57-58. Nor can Plaintiffs' request for "attorneys' fees and costs" fill in the gap. Such expenses are part of the "amount in controversy" only if a plaintiff would be entitled to recover them "under fee-shifting statutes or contract." *Fritsch v. Swift Transp. Co.*, 899 F.3d 785, 793 (9th Cir. 2018). But the complaint identifies no applicable fee-shifting statute or provision in the terms of service entitling Plaintiffs to fees, and Appellants are not aware of any either.[7]

Claims for declaratory and injunctive relief blocking the Ireland and Singapore litigation likewise do not help Plaintiffs cross the threshold, because the "pecuniary result" of that relief is negligible. *Sanchez v. Monumental Life Ins. Co.*, 102 F.3d 398, 405 (9th Cir. 1996). If Plaintiffs obtain declaratory relief and a permanent foreign anti-suit injunction, that simply requires TIUC and TAP to drop

---

[7] To be sure, successful defendants in Ireland are generally entitled to "all costs reasonably incurred in … the defense of the proceedings." Dan Awrey et al., *Resolving the Crisis in U.S. Merger Regulation: A Transatlantic Alternative to the Perpetual Litigation Machine*, 35 Yale J. Reg. 1, 40-41 (2018). But "[c]ourts in … Ireland retain the discretion to deviate from the loser pays principle on a case-by-case basis." *Id.* at 41. And Appellants are not aware of any binding authority holding that a *prima facie* entitlement to costs under foreign common law may be used to satisfy the domestic amount-in-controversy requirement.

their foreign litigation and re-file their claims in the Northern District of California, which will expose Plaintiffs to the same liability and the same litigation costs.[8]

Finally, Plaintiffs cannot hope to evade the terms of service's limitation-of-liability clause, because principles of equitable estoppel "preclude[]" them from "attempting to avoid" the limitation-of-liability clause "while simultaneously" "claiming the benefits" of the forum-selection clause. *Comer*, 436 F.3d at 1101. And even if Plaintiffs were not estopped from challenging the enforceability of the limitation-of-liability clause, *but see supra*, such a claim would plainly fail on the merits. *See Food Safety Net Servs. v. Eco Safe Sys. USA, Inc.*, 147 Cal.Rptr.3d 634, 642 (Cal. App. 2012) ("[L]imitation of liability clauses are enforceable unless they are unconscionable[.]"); *see also Bass v. Facebook, Inc.*, 394 F.Supp.3d 1024, 1037-38 (N.D. Cal. 2019) (holding that a clause limiting "aggregate liability" to $100 in Facebook's terms of service was not unconscionable because, among other things, "[n]o one is forced to enroll in Facebook's social media service").

2. Media Matters (the only Plaintiff who is a party to the Ireland litigation) lacks standing to enforce any clause in any version of any Appellant's terms of service, and the same is true for Carusone. "The party invoking federal jurisdiction bears the burden of establishing" standing with "evidence [of] 'specific facts.'"

---

[8] Indeed, refiling might even expose Plaintiffs to *more* litigation costs, as it will necessarily entail some re-litigation of matters already resolved.

*Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). And "a plaintiff's motion for preliminary injunctive relief" faces a "requirement for substantial proof" that is "much higher" than a "motion for summary judgment." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997). Media Matters and its CEO muster no allegation in the complaint—and certainly have not put forward any actual evidence that could support a preliminary injunction—that they ever had an X account or agreed to X Corp.'s terms of service. Indeed, on any fair reading of the record, the only Plaintiff with an X account who agreed to the terms of service was Hananoki. 3-ER-292; *cf.* 3-ER-287 (Carusone: "I was aware that Eric Hananoki had created and used an X account … I was also aware that in creating the account, Mr. Hananoki agreed to the X [Corp.] (previously known as Twitter) Terms of Service."). And no principle of law nor logic supports allowing Media Matters and Carusone to enforce a contract signed only by Hananoki.

To be sure, non-signatories can sometimes avail themselves of forum-selection clauses if they are "'closely related' to another signatory" such that "the non-signatory's enforcement of the forum selection clause is 'foreseeable.'" *Magi XXI, Inc. v. Stato della Citta del Vaticano*, 714 F.3d 714, 723 (2d Cir. 2013) (collecting cases). But that question turns on "the 'legitimate expectations of the parties.'" *Id.* (quoting *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 12 (1972)). Here, however, Plaintiffs provide no reason to think—and the district court certainly

45

did not find—that when Hananoki created the account at issue, X Corp. had any legitimate basis to know or suspect that the account would be used to further his work for Media Matters or Carusone, let alone foresee that those non-signatories could someday sue as a result. Media Matters and Carusone lack standing to enforce any forum-selection clause.

*　　*　　*

These jurisdictional arguments were fully pressed below, *see* 3-ER-478, 486-87, but the district court said not one word about them—which is reversible error in and of itself. *See Steel Co. v. Citizens for Better Env't*, 523 U.S. 83, 94-95 (1998). In any event, the district court lacks subject-matter jurisdiction.

## B. Subject-Matter Jurisdiction Aside, the Northern District of California Is Not the Proper Venue for this Dispute.

As this Court frequently observes, 28 U.S.C. §1404 gives district courts broad "discretion 'to adjudicate motions for transfer according to an individualized, case-by-case consideration of convenience and fairness,'" *Jones v. GNC Franchising, Inc.*, 211 F.3d 495, 499 (9th Cir. 2000), with special emphasis on "the interest[s] of justice" and whether "all parties have [already] consented" to proceed in a different jurisdiction, 28 U.S.C. §1404(a). While those standards are flexible, there is little doubt how they should shake out here: This case is a textbook candidate for transfer.

Start with considerations of "judicial economy." *Fisher v. Las Vegas Hilton Corp.*, 47 F.App'x 824, 826 (9th Cir. 2002). The district court recognized that one

of the central questions in this case—"whether Media Matters forfeited its right to assert the forum selection clause … by waiting so long" to raise it—was squarely presented in the Northern District of Texas.  1-ER-5-6.  And it has now been squarely resolved by that court.  *See* N.D.Tex.Order.5-9 (holding that Media Matters waived reliance on the forum-selection clause through its litigation conduct, and that its waiver prejudiced X Corp.).  By allowing Media Matters to relitigate the same issue here it just squarely lost there, the district court foisted higher costs on Appellants, wasted scarce judicial resources, and precipitated a real risk of inconsistent judgments.

Relatedly, by acknowledging the forum-selection clause at the pleading stage in the Texas case yet conspicuously declining to invoke it as a basis for transfer until "over 500 days" into the case, Media Matters "'(1) substantially invoke[d] the judicial process [in derogation of the forum-selection clause] and (2) thereby cause[d] detriment or prejudice to the other party.'"  *Id.* at 5 (alterations in original) (quoting *SGIC Strategic*, 839 F.3d at 426).  In such circumstances, transferring this newly filed case to the Northern District of Texas is hardly unfair to Media Matters.  That said, and in stark contrast, allowing parallel litigation in the Northern District of California here would be manifestly *unfair* to Appellants, who have devoted substantial time and resources to the Northern District of Texas litigation (including responding to a still-pending interlocutory appeal).

And, of course, with 18 months of litigation under the bridge and at least five more months of discovery to go in Texas, it would be manifestly *inconvenient* to suddenly require all the same parties and lawyers to start flying to the West Coast, too.  No party has any ongoing connection to California:  X Corp.'s headquarters are now in Texas, 2-ER-15, and as noted, Plaintiffs are based in D.C.  And litigating in California is entirely unnecessary:  Media Matters can already bring all the same arguments and seek all the same relief in the Northern District of Texas.  To be sure, Media Matters may face an uphill battle in that venue, given that the district court there just denied Media Matters' motion to transfer that case to the Northern District of California, holding that it waived reliance on the forum-selection clause and that its "excessive delay" in raising the issue "prejudiced [X Corp.]," N.D.Tex.Order.4-6.  But the very fact that a federal judge has already reviewed and rejected the basic argument Media Matters presses here is further reason to transfer this case to that one.  And when one adds in the equities and public interest discussed above and below, *see* pp.29-36, *supra*; pp.55-56, *infra*, the case for transferring this case to the Northern District of Texas is overwhelming.  Justice requires Media Matters to bring these claims, if at all, in the Northern District of Texas.  To the extent Media Matters disagrees with that court's decisions, it has a right to appeal—but not to undermine that court's considered judgment by seeking a conflicting ruling on the West Coast.

**C.    The District Court's Truncated Application of the *Gallo* Standard Was Demonstrably Erroneous.**

"The threshold consideration for a foreign anti-suit injunction" is whether the court being asked to issue the injunction could actually "'dispos[e] of the action to be enjoined.'"  *Microsoft*, 696 F.3d at 882 (quoting *Gallo*, 446 F.3d at 991).  The answer to that question here is no.  *Contra* 1-ER-2, Media Matters' attempt to invoke X Corp.'s now-defunct forum-selection clause is not "dispositive" of the Ireland litigation, for the simple reason that TIUC is not subject to X Corp.'s terms of service.  TIUC is a distinct entity, operating in a distinct territory, under distinct legal regimes, with a distinct advertising base.  *See* pp.10-11, *supra*.  And most relevant of all, TIUC has distinct terms of service, which did not feature any forum-selection clause at the time Hananoki (mis)used the platform, and which now call for claims to be brought in Ireland (where, of course, an action is already pending).  *See* pp.10-11, *supra*.  In short, TIUC is a different entity without any actionable connection to X Corp.'s terms of service or to California at all.

As all that suggests, the district court lacks personal jurisdiction over TIUC—and, accordingly, the district court cannot "dispos[e]" of anything related to it.  *Cf. Gallo*, 446 F.3d at 991.  A federal district court has personal jurisdiction over a defendant corporation only if the plaintiff plausibly alleges that the corporation is "at home" in the jurisdiction or if the plaintiff alleges an injury "'aris[ing] out of or relat[ing] to the [corporation's] contacts' with the forum."  *Ford Motor Co. v.*

49

*Montana Eighth Jud. Dist. Ct.*, 592 U.S. 351, 358-60 (2021).  Neither is true here.

Plaintiffs affirmatively concede that TIUC is at home in Ireland, meaning that

general jurisdiction is (obviously) off the table.  2-ER-15.  And far from any

allegation that TIUC "purposeful[ly] avail[ed]" itself of anything in California, *see*

*Ford*, 592 U.S. at 359, the complaint recognizes—as it must—that TIUC does not

operate in the United States at all, meaning that specific jurisdiction is lacking too.

After all, TIUC's complete lack of purposeful availment of California means that

even if TIUC were "closely related" to X Corp.'s contract with Hananoki—and it is

not—that still would not be enough.  *See Firexo, Inc. v. Firexo Grp. Ltd.*, 99 F.4th

304, 312 (6th Cir. 2024).  The district court has no jurisdiction over TIUC.

The district court arrived at a contrary conclusion only by deeming TIUC a

"third-party beneficiar[y] of [X Corp.'s] Terms of Service."  1-ER-2.  But the basis

for that conclusion is a mystery.  For a party to constitute a protected third-party

beneficiary, "the terms of the contract" must "make that intent evident."  *Karo v. San*

*Diego Symphony Orchestra Ass'n*, 762 F.2d 819, 821-22 (9th Cir. 1985).  That is

true, for instance, when the contract's "purpose is to make a gift to the [third party]

or "to confer upon the beneficiary a right against the promisor neither due nor

asserted to be due from the promisee to the beneficiary."  Williston §37:7 (citing the

example of a marital separation agreement in which "a husband promise[s] to convey

an interest in a farm to the couple's son … 10 years after the date of the separation

agreement"; the son is not a party to the agreement, but he can sue his father for nonperformance as a third-party donee beneficiary). It is also true when the contract "discharge[s] an obligation of the promisee by rendering a performance to the third party." *Id.* §37:14; *see id.* §37:15 (citing the example of "a former federal prisoner who had been incarcerated in a state institution pursuant to a contract between the State and the federal government"; the former prisoner was a third-party creditor beneficiary who "could bring an action alleging that the State breached its duty" "to keep prisoners safe and to maintain proper discipline and control"). But X Corp.'s terms of service resemble neither paradigm: No provision in the contract singles out TIUC at all, let alone gives TIUC a gift. *See Karo*, 762 F.2d at 822 (a contract must identify a third-party beneficiary either by name or by defining a class of intended beneficiaries); *accord* Williston §37:29.

Of course, even if TIUC were a third-party beneficiary, it would not make TIUC bound by a contract it never signed. It would mean only that TIUC "might in certain circumstances have the power to" enforce X Corp.'s terms of service; it would "certainly" *not* mean that TIUC is "*bound* to a contract that it did not sign or otherwise assent to." *Comer*, 436 F.3d at 1102.

For the same reason, third-party beneficiary status cannot alone confer personal jurisdiction. To be sure, a plaintiff who "seek[s] affirmative relief" on a contract as a third-party beneficiary consents to personal jurisdiction, *SEC v. Ross*,

51

504 F.3d 1130, 1148 (9th Cir. 2007), and cannot avoid any forum-selection clause therein on estoppel grounds, *see* p.44, *supra*. But TIUC has never invoked, and is not seeking any affirmative relief on, a contract, either here or in Ireland; it just wants to continue litigating the tort claims it asserted in its home jurisdiction. And the mere existence of a third-party-beneficiary relationship "clearly ... cannot" itself "automatically establish sufficient minimum contacts" to hale "an out-of-state" defendant into a forum that it lacks any other connection with. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 478 (1985).

That aptly describes what Media Matters seeks to do here—and what the district court erroneously allowed. TIUC is not a third-party beneficiary of X Corp.'s terms of service. And even if it were, it could not be bound by the forum-selection clause; nor could it be haled into the Northern District of California. In short, this litigation cannot be "dispositive" of TIUC's suit in the High Court of Ireland, *see Gallo*, 446 F.3d at 991, because the district court lacks personal jurisdiction over TIUC.

### D.  Plaintiffs Failed to Carry Their Burden on the Remaining Preliminary-Injunction Factors.

It is black-letter law that a party seeking a preliminary injunction "bears the burden of establishing" that it is likely to succeed on the merits, that it is likely to suffer irreparable harm absent an injunction, and that the balance of equities and the public interest favor an injunction as well. *JL Beverage Co. v. Jim Beam Brands*

*Co.*, 828 F.3d 1098, 1105 (9th Cir. 2016); *see* p.27, *supra*. To be sure, in the context of a motion for a preliminary anti-suit injunction, the first factor largely consists of applying *Gallo*. *See Microsoft*, 696 F.3d at 883-84. But nothing in *Gallo* or any other precedent absolves a plaintiff of its burden to establish the remaining factors with competent evidence.

That bedrock principle should have precluded this injunction, since Plaintiffs did not even attempt to carry their burden to show irreparable injury or that the equities and public interest favor injunctive relief. Media Matters submitted no declarations or other evidence about its foreign litigation expenses, and Plaintiffs provided no discussion of the equities and no mention of the public interest. *But see, e.g.*, *Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*, 98 F.4th 1180, 1203 (9th Cir. 2024) (Tallman, J., concurring in part and dissenting in part) ("[W]e need to 'have before us at least some estimate of the harm likely avoided by [the preliminary injunction].'" (alteration in original)). Granting a preliminary injunction when the plaintiffs discuss only one relevant factor is an obvious misapplication of the preliminary-injunction standard, *see Winter v. NRDC*, 555 U.S. 7, 20 (2008), and a classic abuse of discretion, *see Alcantar v. Hobart Serv.*, 800 F.3d 1047, 1051-52 (9th Cir. 2015). This Court should reverse for that reason alone.

Even if Plaintiffs had tried to carry their burden on the remaining preliminary-injunction factors, they plainly would have failed. Carusone and Hananoki face no

irreparable injury at all, as they are not parties to the foreign litigation and thus face no foreign litigation expenses. And Media Matters is not irreparably harmed by having to defend itself in Ireland either, because Irish law provides that "[p]arties who successfully defend proceedings are … *prima facie*[] entitled to the costs to which they have been put in defending what, at the end of the day, the court has found to be unmeritorious proceedings." *Veolia Water UK PLC v. Fingal Cnty. Council* [2006] IEHC 240 ¶2.5 (Ir.), *available at* https://perma.cc/4UR5-TR3K.

The possibility of fee-shifting, combined with Media Matters' tardiness in seeking to enforce the forum-selection clause, should alone doom this extraordinary injunction. After all, the first requirement for any equitable relief is an inadequate remedy at law. *See Pulliam v. Allen*, 466 U.S. 522, 537 (1984) (noting that the principal "requirements for obtaining equitable relief against any defendant" are "a showing of an inadequate remedy at law and of a serious risk of irreparable harm"). When a party promptly seeks to enforce a forum-selection clause, they are entitled to specific performance because the whole point of such a clause is to protect a party from the expense and inconvenience of litigating in a different forum. *See Atl. Marine Const. Co. v. U.S. Dist. Ct. for W. Dist. of Tex.*, 571 U.S. 49, 64 (2013). But Media Matters waited 18 months to invoke it here, while foisting the expense of litigating in Ireland on TIUC. And, on top of that, any fees can be shifted under Irish law if Media Matters prevails there. In these circumstances, there is plainly an

adequate remedy at law.  And when a party "fail[s] to plead an inadequate remedy at law," it "therefore" fails "to state an actionable claim for equitable relief in federal court."  *Sonner v. Premier Nutrition Corp.*, 49 F.4th 1300, 1305 (9th Cir. 2022).

As for the balance of equities, it is hard to see how a plaintiff in Media Matter's position could ever overcome the plain-as-day waiver and laches discussed above.  But, once again, Media Matters did not even try to explain how it could overcome those failings.  Nor did the district court.  The misguided belief "that the X entities' decision to file multiple suits in multiple jurisdictions is designed more to bully Media Matters and inflict financial hardship upon it than to actually vindicate those entities' rights" certainly does not carry the day, not just because it is rank speculation, but also because it is untrue:  There is no evidence in the record that the foreign litigation was brought for any purpose other than recovering a modicum of the revenue and brand equity that TIUC (and TAP) lost in response to Media Matters' misleading and manufactured story about X.  *Contra* 1-ER-2.  That Media Matters is facing litigation on multiple continents is nothing more than a reflection of its own conduct, which inflicted significant damage in jurisdictions other than the United States, and on distinct corporate entities besides X Corp.  At the risk of massive understatement, denying those distinct entities the opportunity to vindicate those local injuries in their home country is not a result that equity favors.

Last but not least, the circumstances of the district court's order cause real harm to the public interest. If a litigant swooped into a foreign jurisdiction on the eve of federal-court litigation and persuaded that foreign tribunal to dash out a two-page order short-circuiting years of case management by an Article III judge, this Court would rightly call foul. But by doing just that to the High Court of Ireland, the decision below serves only to erode the mutual respect and fairness that our system of international comity has come to rely on. Anything less than a prompt reversal will cause lasting harm to the international credibility of the American justice system, and cause courts in Ireland (and elsewhere) to think twice before extending Article III courts the solicitude they otherwise deserve.

## CONCLUSION

The Court should reverse or, in the alternative, vacate and remand.

Respectfully submitted,

s/Paul D. Clement
PAUL D. CLEMENT
MATTHEW D. ROWEN
KEVIN WYNOSKY
NICCOLO A. BELTRAMO[*]
CLEMENT & MURPHY, PLLC
706 Duke St.
Alexandria, VA 22314
(202) 742-8900
paul.clement@clementmurphy.com

[*] Supervised by principals of the firm who are members of the Virginia bar

*Counsel for Defendants-Appellants*
*X Corp., Twitter International Unlimited Co., and Twitter Asia Pacific Pte. Ltd.*

May 14, 2025

## STATEMENT OF RELATED CASES

Undersigned counsel is not aware of any other related cases pending before this Court.  *See* 9th Cir. R. 28-2.6.

May 14, 2025

<u>s/Paul D. Clement</u>
Paul D. Clement

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitation of Circuit Rule 32-1 because this brief contains 13,978 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft Office 365 in 14-point Times New Roman type.

May 14, 2025

<u>s/Paul D. Clement</u>
Paul D. Clement

## CERTIFICATE OF SERVICE

I hereby certify that on May 14, 2025, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the ACMS system. I certify that all participants in this case are registered users and that service will be accomplished by the ACMS system.

s/Paul D. Clement
Paul D. Clement